**MARATHON OIL COMPANY, Survivor By Merger of Husky Oil Company, Petitioner–Appellant, Cross–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee, Cross–Appellant.**

**Nos. 85–2643, 85–2644.**

United States Court of Appeals, Tenth Circuit.

Nov. 9, 1987.

**1116**

J.W. Bullion (J.Y. Robb III, with him, on the brief), of Thompson & Knight, Dallas, Tex., for petitioner-appellant/cross-appellee Marathon Oil Co.

Ernest J. Brown, Atty. (Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup and Richard J. Driscoll, Attys., Tax Div., with him, on the brief), Dept. of Justice, Washington, D.C., for respondent-appellee/cross-appellant C.I.R.

Before LOGAN, McWILLIAMS and MOORE, Circuit Judges.

LOGAN, Circuit Judge.

Husky Oil Company ("Husky") petitioned the United States Tax Court for a redetermination of alleged deficiencies in taxes due for the years 1975, 1976 and 1977.[1] Husky challenged, *inter alia*, (1) the Commissioner's denial of deductions claimed for interest and redemption premium payments made in connection with the retirement of certain debentures; (2) the Commissioner's treatment of $1,082,999 paid by Husky to its parent corporation and sole shareholder, Husky Oil, Ltd. ("Husky Canada"), as an item of income subject to withholding; and (3) the Commissioner's denial of a portion of the deductions and investment tax credits claimed in connection with Husky's operation of certain oil and gas properties (the Home–Stake properties). The Tax Court found in favor of the Commissioner on the first two issues and in favor of Husky on the third. *Husky Oil Co.*, 83 T.C. 717 (1984). Both parties have appealed.

---

**1.** Following initiation of the tax court proceeding, Husky Oil Company merged into Marathon Oil Company, which was substituted as petitioner.

**2.** Debentures totalling $500,000 were purchased by Husky in 1974. In 1973 and 1974, another $1,015,000 were converted into Husky Canada

## I

### The Debentures Issue

In January 1972, Husky offered and sold to the public $25,000,000 of 6¼% convertible subordinated debentures dated January 15, 1972, and maturing January 15, 1997. The debentures were issued under an indenture, the parties to which were Husky as issuer, Husky Canada as guarantor, and Bankers Trust Company as trustee.

The debentures were issued in $1,000 denominations and were convertible, at the holder's option, into common shares of Husky Canada at an initial conversion price of $20 per share, subject to adjustment for contingencies not relevant here. To convert the stock, the holder was required to surrender the debenture to a New York agency maintained by Husky and Husky Canada pursuant to § 6.02 of the indenture. Husky retained an option to redeem the debentures at any time for a price equal to the principal amount and interest accrued through the redemption date, plus, if the redemption occurred before June 15, 1992, a premium based on schedules set forth in the indenture.

Debentures in the principal amount of $1,515,000 were retired by transactions before the taxable years at issue.[2] During 1975, $295,000 of debentures were retired through purchase by Husky. Also, between January 1, 1975, and May 31, 1977, $1,136,000 of debentures were converted into shares of Husky Canada. Husky Canada retained these debentures rather than surrendering them to the trustee for cancellation, but collected no interest on them until the July 1, 1977 intercompany note transactions discussed hereafter.

On June 1, 1977, Husky gave notice of its election to redeem all of its outstanding debentures on July 1, 1977. At that time,

---

shares; of these $86,000 were contributed by Husky Canada to Husky as capital contributions and the balance was credited to an intercompany account payable, without any premium or interest payment, by issuing Husky common stock to Husky Canada on July 1, 1975.

$22,054,000 of debentures were outstanding in the hands of the public. The redemption price per $1,000 of these debentures was computed as follows:

| | |
|---|---|
| Principal amount | $1,000.00 |
| Premium (4.68%) | 46.80 |
| Interest (from 1/15/77 to 7/1/77) | 28.60 |
| Total | $1,075.40 |

As of May 31, 1977, the market price of Husky Canada's common stock was $25.50 per share. Conversion at the specified rate of fifty shares per $1,000 debenture would therefore have resulted in $1,275 market value of shares for each $1,000 debenture.

By the close of business on June 16, 1977, the last date on which debenture holders could exercise conversion rights, $22,005,000 of the called debentures had been converted into shares of Husky Canada. On July 1, 1977, Husky redeemed the remaining $49,000 of publicly held debentures. On that day, to pay Husky Canada for the debentures that had been converted to its stock, Husky issued two five percent subordinated notes to Husky Canada, one in the amount of $1,136,000, representing the debentures converted before the June 1 call, and the other in the amount of $22,005,000, representing the principal amount of the debentures converted during June. In July and August 1977, Husky paid a total of $1,723,287 in cash to Husky Canada for accrued interest and redemption premiums allegedly due on the converted debentures held by Husky Canada on the redemption date.[3]

In its tax return for 1977, Husky deducted the following: premium and interest of $1,836,279 ($1,723,287 paid plus $112,992 withholding for taxes) which Husky allegedly owed to Husky Canada for redemption of the debentures that the latter held; $578,525 in accrued interest on the promis-

sory notes issued to Husky Canada; and premium and interest of $3,694 paid on debentures redeemed from the public ($75.40 × 49). All deductions were taken pursuant to I.R.C. § 163(a). The Commissioner denied all but the $3,694 deduction, on the theory that no valid indebtedness existed between parent and subsidiary because Husky's obligation on the debentures was expunged upon conversion to Husky Canada stock.

The Tax Court held that the principal amount of the converted debentures remained an outstanding debt of Husky, and allowed the deduction of interest on the promissory notes given to retire those debentures. *Husky Oil*, 83 T.C. at 734–35. The Commissioner does not appeal this holding. The Tax Court also held, however, that, under the indenture, Husky had no obligation to pay interest or redemption premiums to Husky Canada on converted debentures. *Id.* at 735. It therefore disallowed the $1,836,279 deduction. Husky has appealed this disallowance.

Husky's argument on appeal centers on § 5.11 of the indenture, which provides: "All Debentures delivered to the Guarantor [Husky Canada] upon conversion pursuant to this Article Five (hereinafter in this Section 5.11 called 'Converted Debentures') shall be imprinted with a legend indicating such conversion and held by the Guarantor, and may, at any time at the discretion of the Guarantor, be surrendered to the Trustee for cancellation. Converted Debentures shall not be further convertible into Common Stock, and shall not be redeemable, whether by operation of the Sinking Fund provided for in Article Four or otherwise, unless all Debentures at the time outstanding held by persons other than the Guaran-

---

3. This amount was computed as follows:

| Debentures converted from June 1, 1977 through June 16, 1977—Principal Amount $22,005,000 | Premium and Interest |
|---|---|
| Premium 4.68% of $22,005,000 | $1,029,834 |
| Interest 1/16/77 to 6/16/77 2.603% of $22,005,000 | 572,790 |
| Interest 6/16/77 to 7/1/77 .257% of $22,005,000 | 56,553 |
| Subtotal | $1,659,177 |
| Debentures converted from April 2, 1975 to May 11, 1977—Principal Amount $1,136,000 | |

| | |
|---|---|
| Premium 4.68% of $1,136,000 | $ 53,165 |
| Interest from date of conversion (various) to 1/15/77 | 88,437 |
| Interest from 1/15/77 to 7/1/77 3.125% of $1,136,000 | 35,500 |
| Subtotal | $ 177,102 |
| Grand Total | $1,836,279 |
| Less 15% withholding for taxes on the total interest of $753,280 | ( 112,992) |
| Amount of cash ultimately paid by Husky to Husky Canada | $1,723,287 |

tor shall be redeemed at the same time. The Guarantor may extend or consent to the extension of the time for the payment of interest, and may waive interest on all or any Debentures held by it.

The indebtedness evidenced by Converted Debentures, including the principal thereof and premium, if any, and interest thereon, and the Guarantee thereof, shall be subordinate and subject in right of payment to all other Debentures, to the same extent and in the same manner that the indebtedness evidenced by the Debentures is subordinate and subject in right of payment to Senior Indebtedness, all as set forth in Article Three of this Indenture."

Husky contends that § 5.11, particularly the language referring to subordination of interest and premium payments on converted debentures, clearly indicates that the parties intended that converted debentures would remain outstanding in Husky Canada's hands unless voluntarily surrendered for cancellation, and that Husky Canada would have a right to accrued interest and premium payments in the event of redemption.[4]

Husky's position assumes that Husky had to treat its parent Husky Canada the same as any other third party guarantor, and that the indenture, particularly § 5.11, substituted and treated Husky Canada essentially as an outside debenture holder after the public holders chose conversion to Husky Canada shares rather than redemption by Husky pursuant to its call.

The Commissioner challenges this assumption by presenting several arguments, two of which focus on the economic reality of the Husky–Husky Canada transaction. The first is that Husky and Husky Canada must be treated as one entity for purposes of the case before us. The Commissioner also argues that Husky Canada, by issuing its stock to the public debenture holders who chose conversion over Husky's redemption offer, is in the same position as any sole shareholder who discharges corporate debt to enhance the value or secure the safety of its investment and thereby makes a capital contribution to the corporation.

Because Husky is wholly owned by Husky Canada and Husky's stock is not traded, Husky can gain access to the lower interest rates available in the convertible debenture debt market only by offering conversion to the stock of its publicly traded parent. Such a transaction is common, and here was beneficial to Husky Canada as 100% owner of Husky. *See, e.g., National Can Corp. v. United States*, 687 F.2d 1107, 1108–10 (7th Cir.1982). The public debenture holders choosing to take equity, stock in Husky Canada, rather than extinguishment of the debt through redemption, gave up the accrued interest and the redemption premium. *See Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 305–06 (2d Cir.1971). If Husky, rather than Husky Canada, had issued the stock received by those who chose conversion, then under the established case law Husky could not obtain a tax deduction for interest or premium the debenture holders gave up by converting into equity. *See, e.g., Tandy Corp. v. United States*, 626 F.2d 1186, 1193–94 (5th Cir.1980); *Columbia Gas System, Inc. v. United States*, 473 F.2d 1244, 1247–49 (2d Cir.1973); *Bethlehem Steel Corp. v. United States*, 434 F.2d 1357, 1360–61 (Ct.Cl.1970). The Commissioner argues that to allow Husky Canada to treat itself as a substitute debenture holder, instead of an issuer of stock subject to the rationale of those cases, would elevate form over substance and permit manipulation for tax advantage, because Husky Canada as Husky's 100% owner could choose to be paid interest and premiums or could decline them, as it did in connection with the 1973 and 1974 conversions.

Alternatively, the Commissioner asserts that by issuing its stock to converting debenture holders, Husky Canada paid off

---

**4.** Under Treas.Reg. § 1.163–4(c) (1973) and I.R.C. § 249, a premium paid on redemption of convertible debentures is deductible as interest by the issuing corporation to the extent it does not exceed a "normal call premium," defined by Treas.Reg. § 1.249–1(d)(2) (1973) as an amount not in excess of one year's interest.

Husky's corporate debt, which it had guaranteed; and that this should be treated no differently than any other transaction in which a controlling shareholder pays off corporate debt to enhance the value of its investment. Were we to accept this argument, we would treat the debt discharge as a capital contribution, *see* Treas.Reg. § 1.118–1 (1956); *Lidgerwood Manufacturing Co. v. Commissioner*, 229 F.2d 241, 243 (2d Cir.1956); *Menihan v. Commissioner*, 79 F.2d 304, 306 (2d Cir.), *cert. denied*, 296 U.S. 651, 56 S.Ct. 368, 80 L.Ed. 463 (1935), and increase Husky Canada's basis in its Husky stock by the amount which the debt discharge enriched Husky. *See* I.R.C. § 1016(a)(1).

While there is much to be said for the government's theories on an economic reality basis, they present two problems. First, the Internal Revenue Code permits parent and subsidiary corporations to treat themselves as separate entities for many tax purposes. *See, e.g.,* I.R.C. § 1501 (privilege to file consolidated returns); *Campbell v. Carter Foundation Production Co.*, 322 F.2d 827, 831 (5th Cir.1963) ("transactions between parent-subsidiary corporations are not to be disregarded for tax purposes merely because of that relationship."); *see generally Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). Acceptance of the Commissioner's arguments, if carried too far, would mean parent and subsidiary could not structure a transaction between them as debt. Second, as Husky points out, the Tax Court did treat the principal balance of the converted debentures as debt owed from the subsidiary to the parent. *Husky Oil*, 83 T.C. at 734–35. The Commissioner argues that recognition of the converted debentures as debt was not essential to the Tax Court's decision. But we do not agree. The Tax Court did allow Husky to deduct interest payments on notes evidencing that debt, *id.* at 735, and the Commissioner does not appeal that allowance.

We need not rule directly upon whether the Internal Revenue Code would permit Husky Canada to be treated as a substitute creditor after the conversion. The court assumed that the parent could be a creditor of the subsidiary corporation, but, as we read its holding, ruled that this indenture did not express an intent to treat Husky Canada, after the conversion, as a substitute debenture holder entitled to premium and interest accrued to the date of conversion.

In discerning the intent of the parties, the Tax Court looked to the document as a whole. It responded to Husky's § 5.11 argument by declaring that "it distorts the meaning of the indenture to isolate § 5.11, which is only intended to subordinate the debt of converted debentures ... to the debt of all other debentures, and conclude that ... the indenture requires petitioner to pay interest and premiums on converted debentures." *Husky Oil*, 83 T.C. at 732. The court interpreted the reference to "debentures" in § 5.11 as meaning something different than "converted debentures." *Id.* The court referenced other sections of the indenture, stating that because those provisions "must be read in the context of the entire 105–page indenture, ... we must also consider ... [the effect of the public debenture holder's exercise of other] conversion rights upon the right to receive interest and premium." *Id.* It then analyzed the "no adjustment" clause in § 5.03 of the indenture and discussed *Tandy* and other cases. *Id.* at 732–35. Finally, it returned to § 5.11 and held that when read in the context of the entire indenture, the section evinces an intention that Husky repay principal. *Id.* at 735. The Tax Court went on to hold, however, that the conversion did extinguish Husky's obligation to pay accrued interest and premium. *Id.*

■ We must treat the Tax Court's findings, based upon its reading of the indenture, as fact findings, to which we apply a clearly erroneous standard of review. "This is so even when the [Tax Court's] findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

■ Although our analysis of the indenture might have been different, we cannot find the Tax Court's conclusion clearly erroneous. One plausible reading of § 5.11 is that debentures surrendered for Husky Canada stock, at Husky Canada's option, may retain their status as outstanding debentures, and that although Husky Canada could not force redemption, upon a call of all debentures it would be entitled to accrued interest and premium. But that interpretation is not compelling, in light of other provisions in the indenture. As the government points out, § 2.08 undermines the notion that Husky and Husky Canada stood at arms' length as debtor and creditor. That section states that all debentures surrendered for conversion shall, if surrendered to "the Company [Husky] or any paying agent," be delivered to the trustee for cancellation, with no debentures issued in lieu thereof. Because Husky Canada and Husky jointly maintained the office through which all debentures the public surrendered for conversion presumably must have passed, *see* indenture §§ 6.02 and 6.05, § 2.08 appears to some extent to conflict with Husky's reading of § 5.11.

In addition, while one may read indenture § 5.03 to mean that only public holders of debentures have no rights to interest or premiums upon conversion,[5] the section's prohibition of interest and premium at least raises questions why Husky Canada should be given such rights when public holders of debentures give them up if they convert to stock. Indenture § 4.01 provides for a reduction in Husky's required payments to the sinking fund respecting debentures converted to Husky Canada stock before the date fixed for redemption. This can be construed as a recognition that Husky Canada is not entitled to normal redemption rights.

Finally, in many places throughout the indenture Husky Canada, identified as the Guarantor, is explicitly or implicitly treated as other than a "holder of debentures" in the normal sense of that term. For example, in § 10.04, Husky is explicitly omitted when determining whether debenture holders have concurred in any "direction, consent or waiver under this Indenture." In other places the exclusion is implicit. *See* §§ 4.02, 7.02(c), 7.03(c), 8.01(e), 8.06, 9.10. Thus, we cannot hold as clearly erroneous the Tax Court's finding that under the indenture Husky Canada was not to stand, after conversion, in the same position as a public debenture holder who surrenders his shares for redemption after a call.

■ Neither do we find that the law requires a different result than that reached by the Tax Court. Husky cites no code section or case that requires these payments between Husky and Husky Canada be made or be recognized for tax purposes. Husky must acknowledge that its parent, Husky Canada, could treat the discharge of Husky debt as a capital contribution. Indeed, Husky Canada did so with respect to the debentures converted in 1972 and 1974. Husky must also acknowledge that Husky Canada could forego interest and premium on the debentures. Husky Canada did not collect interest on debentures converted in 1973 and 1974. It did not collect on 1975 to 1977 conversions until it included the accrued amounts in notes executed on July 1, 1977. Further, indenture § 5.11 expressly permits Husky Canada to waive interest owed it by Husky on the debt for the converted debentures. Husky Canada, as 100% owner, has complete control of Husky. We believe that the separate treatment for tax purposes of parent and wholly-owned subsidiary should not be extended when we can see no business purpose beyond an opportunity to manipulate for tax advantage. We therefore affirm the Tax Court's denial of the tax deduction for premium and interest paid Husky Canada by Husky.

---

5. Indenture § 5.03 reads as follows:
   "No adjustments in respect of interest or dividends shall be made upon the conversion of any Debenture or Debentures; *provided, however,* that nothing contained herein shall alter or impair the obligation of the Company to pay interest on any Debenture on any interest payment date notwithstanding the conversion of such Debenture between the close of business on the record date next preceding such interest payment date and such interest payment date."

## II

### The Withholding Issue

■ Husky argues that the Tax Court erred in holding that the cash premium of $1,082,999 paid to Husky Canada in connection with Husky's redemption of the converted debentures constituted an item of income to Husky Canada under I.R.C. § 1441(b), from which Husky was required to withhold tax pursuant to I.R.C. § 1442. Section 1442 provides, in part: "In the case of foreign corporations subject to taxation under this subtitle, there shall be deducted and withheld at the source in the same manner and on the same items of income as is provided in section 1441 a tax equal to 30 percent thereof." I.R.C. § 1442(a). The items of income subject to withholding under § 1441 include "interest ..., dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income...." I.R.C. § 1441(b).

Husky contends that the term "premiums," as used in I.R.C. § 1441(b), refers only to insurance premiums and does not include bond premiums; and further that bond premiums do not meet the overall definition of "fixed or determinable annual or periodical income." The Tax Court did not reach this issue, because it rejected Husky's characterization of the payment as a bond premium. *Husky Oil*, 83 T.C. at 737. In section I of this opinion, we affirmed the Tax Court's refusal to characterize this payment as a bond premium. Because Husky has made no other argument for exclusion from withholding under I.R.C. § 1441(b), we must affirm the Tax Court's decision on the withholding issue.

## III

### The Intangible Drilling Costs Issue

The third issue in this case requires us to determine Husky's entitlement to deductions for depreciation and intangible drilling and development costs, as well as investment tax credits, in certain oil and gas ventures acquired from Home–Stake Production Company ("Home–Stake").

Home–Stake sold "units of participation" in oil and gas ventures to public investors. These units represented direct ownership of undivided working interests in oil and gas leases. In 1973, Home–Stake filed a petition in federal court for reorganization under the prevailing bankruptcy laws. In June 1974, the bankruptcy court approved an agreement between Home–Stake's bankruptcy trustee and Husky, whereby Husky assumed responsibility for operating and developing the oil and gas leases comprising Home–Stake's investment programs.

The agreement divided the leases into two geographic groups, Unit Area A and Unit Area B; the present controversy is limited to deductions and credits claimed with respect to Unit Area A. At the time of the agreement, Unit Area A consisted of six oil and gas leases and included seventy-five existing wells and a pipeline.

Under this agreement, the bankruptcy trustee transferred all of Home–Stake's interests in the leases and related property to Husky, to be held in trust for the benefit of those owning units of participation. As consideration for this transfer, Husky paid the bankruptcy trustee $180,000, half of which Husky was entitled to recover from net revenues from the properties.

The agreement further required Husky to advance and pay all operating expenses, rents and royalties, to purchase or sell all the oil and gas produced, and to plug and abandon wells whenever Husky deemed it advisable. In addition, it obligated Husky to make all necessary capital expenditures for development of the properties and improvement of existing wells, at least until such expenditures amounted to $3,000,000, at which time the participants had a one-time opportunity to elect to pay their pro rata share of any further capital expenditures. Under the agreement, Husky acquired a five percent "participating interest" in Unit Area A for each $750,000 in capital expenditures that it contributed to that Unit, up to a twenty percent interest for $3,000,000 in capital expenditures. Thereafter, Husky would earn an additional ten percent participating interest for each $8,000,000 distributed to participants

other than Husky, until it had a total maximum fifty percent participating interest in Unit Area A. As of December 31, 1977, Husky had made a total of $2,840,416 in capital expenditures, partly for work on existing wells and partly for drilling four new wells. These had earned Husky a five percent participating interest on June 1, 1975, which rose to ten percent on November 1, 1975, and fifteen percent on August 1, 1976.

Under the agreement the income from Unit Area A for each month was applied first to payment of rents and royalties, and second to operating costs incurred for that month. Seventy-five percent of any monthly income in excess of such costs was available to reimburse Husky for uncovered interim operating expenses and one-half its original payment for the transfer of Home–Stake's interests, and to cover operating deficits from prior months. Until Husky had made capital expenditures totalling $3,000,000, the remaining excess income was to be distributed to the participants, including Husky, in proportion to their interests.[6]

On its tax returns for 1975, 1976 and 1977, Husky took deductions for depreciation and intangible drilling and development costs, and claimed investment tax credits for amounts expended on Unit Area A. The Commissioner's notice of deficiency reduced the amount of deductions and investment tax credits, to correspond to Husky's participating interest in Unit Area A for the years in question.

The Tax Court held that because Husky "carried the burden of the total working interests and thus had the comprehensive economic interest in Unit Area A during 1975, 1976, and 1977, it is entitled to deduct the intangible drilling and development costs and to claim depreciation and investment tax credits attributable thereto." 83 T.C. at 741. The Commissioner has appealed this determination.

**6.** After Husky had made capital expenditures totalling $3,000,000, 75 percent of any excess monthly income was, to the extent remaining after the payments specified above, to be paid to Husky and any participants electing to make

Treasury Regulation § 1.612–4 (1965) governs the deductibility of intangible drilling and development costs. This regulation was promulgated under the authority of I.R.C. § 263(c), which requires the Secretary of the Treasury to prescribe regulations granting "the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells" which might otherwise be treated as capital expenditures under § 263(a). *See Harper Oil Co. v. United States*, 425 F.2d 1335, 1338–42 (10th Cir.1970) (discussing the history of the option). The regulation provides, in part:

"(a) *Option with respect to intangible drilling and development costs.* In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. . . .

. . . .

. . . Included in this option are all costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property whether incurred by him prior or subsequent to the formal grant or assignment to him of operating rights (a leasehold interest, or other form of operating rights, or working interest); *except* that in any case where any drilling or development project is undertaken for the grant or assignment of a fraction of the operating rights, only that part of the costs thereof which is attributable to such

capital expenditures until 150 percent of such expenditures were recovered. The remaining excess income was to be distributed to the participants, including Husky.

fractional interest is within this option. In the excepted cases, costs of the project undertaken, including depreciable equipment furnished, to the extent allocable to fractions of the operating rights held by others, must be capitalized as the depletable capital cost of the fractional interest thus acquired."

Treas.Reg. § 1.612–4(a) (emphasis added).

The Commissioner argues that because Husky received a fractional interest in the proceeds distributed to participants in exchange for its capital contributions, the "except" clause of Treas.Reg. § 1.612–4(a) places corresponding limitations on Husky's deductions for intangible drilling and development costs and depreciation. The Commissioner points to Husky's acquisition of interests in existing wells and asserts that under the agreement Husky recouped its intangible drilling costs from production from existing and newly drilled wells and had to share proceeds from all of the wells with others. Husky, on the other hand, argues that it "accepted the responsibility and risks associated with the working interest and paid all costs during the years in question," Taxpayer's Brief at 47, and is entitled to the corresponding deductions.

The crucial issue here, as the Tax Court correctly identified, is whether Husky acquired all of the "operating rights" in the leases at the outset of the agreement, or only incrementally during the years at issue while other investors retained working interest rights. We agree with the Tax Court's conclusion that the scheme from its inception gave all of the operating rights to Husky.

As used in Treas.Reg. § 1.612–4(a), the terms "operating rights," "operating interest," and "working interest" appear to be synonymous. See *Miller's Oil and Gas Federal Income Taxation* ch. 13–1, at 202 (J. Houghton ed. 1983) ("A working interest is sometimes referred to as an 'operating interest,' but both terms convey the same meaning since the interest involved is burdened with all operating costs."). It is the burden of operating and developing the property that distinguishes the operating or working interest from nonoperating interests such as royalty or net profits interests. See *Brooks v. Commissioner*, 424 F.2d 116, 122 (5th Cir.1970); I.R.C. § 614(d) (defining "operating mineral interest" for depletion purposes as including "only an interest in respect of which the costs of production of the mineral are required to be taken into account by the taxpayer for purposes of computing the 50 percent [of taxable income] limitation provided for in section 613"); Treas.Reg. § 1.614–2(b) (1965) (excluding "royalty interests or similar interests, such as production payments or net profits interests" from the definition of "operating mineral interest").

Both the Commissioner and Husky rely strongly on *United States v. Cocke*, 399 F.2d 433 (5th Cir.1968) (en banc), *cert. denied*, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed. 2d 455 (1969). In one of the leases at issue in *Cocke*, Humble Oil agreed to drill and develop for a fifty percent production interest. Humble was required to advance all costs and could recoup them only out of its own and one-half of the other owners' shares of production, if any. Cocke, who made no contribution except for sums deducted under the agreement before distribution to him, claimed deductions on his tax returns for depletion, expenses and intangible development costs. The court disallowed the deductions except for depletion on amounts actually distributed to Cocke, holding that although Cocke had title, he had neither incurred the expenses nor assumed any risk. While the *Cocke* opinion did not deal with the deductions available to Humble, whose position was comparable to Husky's in the case before us, we believe the case supports Husky's contentions and not the Commissioner's.

*Cocke* held that title ownership is not controlling. Rather, the economic risk of development is most important. *Cocke* clearly implied that the deductions were available to Humble as the party which paid them and bore the risk of loss.

"The same deductions cannot be taken by two parties. We here must determine which of the two is to be the beneficiary of the largesse. Our answer is the more intrepid of the two. Humble here made

the essential contribution of risk capital for the enterprise. When the agreements were signed, Humble received from the Cockes the right to use the first oil produced to recoup that capital."

399 F.2d at 452.

■ Under the agreement before us, Husky assumed the entire burden of operation and further development of Unit Area A for the life of the property, subject only to the options of the other participants to begin paying their shares of capital expenditures after Husky had contributed its initial $3,000,000.[7] Husky could look only to the proceeds from the oil and gas produced to recoup its costs. Husky therefore held the entire operating interest in Unit Area A during the years in question. Because the other participants were permanently relieved of the burden of operation and development and simply received a share of the proceeds remaining after payment of certain specified costs, their interests must be characterized as "net profits" rather than "operating" interests for tax purposes. *See United States v. Thomas*, 329 F.2d 119, 130 & n. 2 (9th Cir.) (en banc), *cert. denied*, 379 U.S. 819, 85 S.Ct. 39, 13 L.Ed. 2d 31 (1964); *Callahan Mining Corp. v. Commissioner*, 428 F.2d 721, 725 (2d Cir.), *cert. denied*, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970).[8]

This characterization conflicts to some extent with our decision in *Reynolds v. McMurray*, 60 F.2d 843 (10th Cir.), *cert. denied*, 287 U.S. 664, 53 S.Ct. 222, 77 L.Ed. 573 (1932). There McMurray and the Ohio Oil Company owned undivided interests in certain oil leases. Ohio Oil had agreed to manage, control, develop and operate the leases, to pay all costs incident to those activities, and to look only to McMurray's share of the proceeds for payment of his share of the costs. *Id.* at 843.

The issue on appeal was "whether that portion of Will McMurray's share of the receipts from such leases applied to reimburse the Ohio Company for expense of development and operation, less proper deductions, was income to Will McMurray for the years involved, and therefore subject to the tax." *Id.* at 844. This court held that it was, even though Ohio Oil alone bore the risk that proceeds from the wells would not be sufficient to cover the costs of development and operation. The court noted that the result might have been different had McMurray relinquished his rights in the leases in return for a percentage in the net profit, but that "such was not the effect of the agreements.... The purpose of the agreements was to facilitate development; not to transfer title. The title of the respective owners remained as before." *Id.*

To the extent that participants other than Husky retained title to the oil and gas leases in Unit Area A, *McMurray* could be read as requiring allocation, for tax purposes, of a corresponding share of the income and operating costs to those interests. Such a title-based approach, we now believe, is incorrect. The Supreme Court has held that, when natural resources are concerned, economic interests, not concepts of property law, control. Thus, in *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933), the Court applied the "economic interests" test and held that a lessor's right to the depletion allowance "does not depend upon his retention of ownership

---

7. The existence of an unexercised option belonging to the other participants to begin making capital contributions after a certain point does not diminish or otherwise alter Husky's interest in the property during the years in question. *Cf. United States v. Swank*, 451 U.S. 571, 585, 101 S.Ct. 1931, 1939, 68 L.Ed.2d 454 (1981) (existence of lessor's unexercised right to terminate lease did not destroy lessee's economic interest in the leased mineral deposits for depletion purposes).

8. Husky contends that we should view the other participants as owning perpetual carried working interests rather than net profits interests, because they were entitled to share in proceeds from equipment salvage. We see no reason why this factor should affect the tax treatment of any of the interests involved. *See Cocke*, 399 F.2d at 444-47 (retention of interest in equipment by perpetually carried party insufficient to distinguish that party's interest from net profits interest found in *Thomas* ); *Miller's Oil and Gas Federal Income Taxation* ch. 16–8, at 269 (J. Houghton ed. 1983) ("From a practical standpoint, no economic differences are perceived between an unlimited carried interest arrangement and a net profit arrangement").

or any other particular form of legal interest in the mineral content of the land." *Id.* at 557, 53 S.Ct. at 227. Rather, the Court held, the allowance is available to any taxpayer who "has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." *Id.; see also Kirby Petroleum Co. v. Commissioner,* 326 U.S. 599, 604, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946) ("Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil.").

Subsequent cases involving the depletion allowance similarly reject the title-based approach and apply the "economic interests" test. *See Cocke,* 399 F.2d at 444–47; *Thomas,* 329 F.2d at 130. After review by the entire court, we are authorized to state that to the extent that *McMurray* would require allocation of a portion of the operating income and deductions to participants other than Husky during the years in question, it is hereby overruled. The Commissioner long ago took the position that *McMurray* was incorrectly decided. Gen. Couns.Mem. 22,730, 1941–1 C.B. 214, 223–24.

▇▇▇ If taxation of oil and gas interests is to be determined by economic reality rather than form, then the party who bears the economic risks associated with the operating interest in an oil and gas lease must also be entitled to claim the deductions associated with that interest, whether or not that party possesses the legal or equitable title to the lease. Under Treas. Reg. § 1.612–4(a), intangible drilling and development costs may be deducted by an "operator," defined as "one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease *or any other form of contract granting working or operating rights*" (emphasis added). The agreement at issue here granted Husky the exclusive operating rights in Unit Area A. When the party undertaking a drilling or development project has acquired such entire oper-

ating interest in the subject property, the "except" clause of Treas.Reg. § 1.612–4(a) regarding fractional operating interests does not apply, even if a percentage of gross revenues from the property is payable to the holders of other interests. We therefore hold that a party who bears all costs of operation and development and who can only recoup these costs out of oil revenues, has a one hundred percent operating interest.

AFFIRMED.