H.J. FREEDE;  Josephine W. Freede;
Roger S. Folsom;  and Mary M.
Folsom, Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent–Appellant.

Nos. 86–2401, 86–2403.

United States Court of Appeals,
Tenth Circuit.

Nov. 1, 1988.

As Amended on Denial of Rehearing and
Rehearing En Banc Jan. 27, 1989.

Bruce R. Ellisen (Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup, and Ann Belanger Durney, with him on the briefs), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellant.

Terry R. Hanna of Crowe & Dunlevy (Donald R. Lisle and Charles N. Woodward of Lisle & Woodward, Oklahoma City, Oklahoma, with him on the brief), Oklahoma City, Okl., for petitioners-appellees.

Before MOORE, BARRETT and EBEL, Circuit Judges.

EBEL, Circuit Judge.

H.J. and Josephine Freede and Roger and Mary Folsom ("Taxpayers") petitioned the United States Tax Court for redetermination of alleged deficiencies in taxes for the 1979 tax year.[1] The deficiencies relate to certain excess payments they received from Oklahoma Gas & Electric Company ("OG & E") under a "take or pay" provision in gas supply contracts for gas not taken by OG & E during the year in question. A divided Tax Court held in favor of Taxpayers, finding that the excess payments created "production payments" within the meaning of Section 636(a) of the Internal Revenue Code, 26 U.S.C. § 636(a), and Treas.Reg. § 1.636–3(a), 26 C.F.R. § 1.636–3(a), and therefore should be treated as nontaxable loans with income recognized only when the gas is actually delivered. *Freede v. Commissioner*, 86 T.C. 340 (1986). The Commissioner has appealed, arguing that the excess payments did not create production payments and should be included as income for the year received pursuant to I.R.C. §§ 61(a) & 451(a).[2] We agree with the Commissioner because the excess payments did not give OG & E an economic interest in the gas in place. Accordingly, we reverse.

### I.

Taxpayers own fractional working interests in various oil and gas leases in Okla-

homa. In 1975 and 1976, they entered into "take or pay" gas purchase contracts with OG & E.[3] Under these contracts, OG & E agreed to pay for a specified minimum quantity of gas each year, regardless of whether it took physical delivery of the gas. If the amount of gas paid for under the "take or pay" provision exceeded the amount of gas actually taken from Taxpayers' wells, OG & E had the right to credit the excess amount in later years against gas taken in excess of the minimum contract quantity.[4] However, OG & E would lose the benefit from any excess payments that it did not recoup by taking extra gas within the twenty-year term of the contracts.

In 1979, OG & E made the minimum payment required by the contracts but took less than the minimum contract quantity. Thus, a portion of the contractual payments that Taxpayers received from OG & E in 1979 represented payment for gas not actually taken in that year. At that time, the leases had sufficient projected reserves to enable OG & E to recoup the untaken gas in later years if it wanted to do so.

Although Taxpayers were on the cash, as opposed to accrual, method of accounting, they did not include as income the amounts received in 1979 for gas not taken that year. They maintained, and the Tax Court agreed, that OG & E's excess payments created "production payments" pursuant to I.R.C. § 636(a), 26 U.S.C. § 636(a), and therefore the payments should be treated

---

1. Josephine Freede and Mary Folsom are parties solely because they file joint returns with their husbands.

2. I.R.C. § 61(a), 26 U.S.C. § 61(a), provides that gross income includes "all income from whatever source derived." I.R.C. § 451(a), 26 U.S.C. § 451(a), provides:

   The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

3. Although Taxpayers did not appear on the contracts as parties, they were bound by them and performed and received performance as a

seller under the terms of the contracts. The contracts are virtually identical and will be referred to collectively.

4. The contract specifically provides:

   If Buyer shall be required to pay for any gas not taken and received during any contract year, Buyer shall have the right to make up such deficient gas volumes by crediting the volumes of gas so paid for and not taken against such gas as may be taken during any subsequent contract year during the term hereof in excess of the applicable minimum contract quantity for such year. Such gas shall be taken at no additional cost to Buyer.

for income tax purposes as if they were loans, with income recognized only when the gas is actually delivered in subsequent years.[5] We disagree.

## II.

■ In order for OG & E's right of recoupment to constitute a production payment under Section 636(a), several criteria must be satisfied: (1) OG & E must have a right to a specified share of gas production or the proceeds from such production; (2) the right must have a specified economic life (at the time of its creation) of less than the economic life of the mineral property which it burdens; (3) the right must be an economic interest in the mineral in place; (4) the right cannot be satisfied by other than the production of gas from the burdened mineral property; and (5) the right must be limited by either a dollar amount, a quantum of mineral, or a period of time. *See* Treas.Reg. § 1.636–3(a)(1).[6] On appeal, the Commissioner challenges the Tax Court's conclusion with respect to just one of these criteria—that OG & E's recoupment right constituted an "economic interest" in the minerals in place.

A test for determining the existence of an "economic interest" in minerals in place has been derived from *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). In that case, the taxpayers had transferred their operating rights in certain oil and gas leases to oil companies in exchange for bonus payments and a right to royalties from the oil produced and saved.

They sought to claim depletion on the revenue received. The Tax Commissioner argued that the taxpayers were not entitled to a depletion allowance because the taxpayers had, in effect, sold the leases. In rejecting the Commissioner's argument, the Court held that an economic interest did not depend upon legal title to the mineral. *Id.* at 557, 53 S.Ct. at 226. Instead, the Court focused on the taxpayers' investment in the oil in place:

> [The depletion statute covers] every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital.

*Id.* Under that analysis, the Court found that the taxpayers there had "retained, by their stipulations for royalties, an economic interest in the oil, in place." *Id.* at 558, 53 S.Ct. at 227. The Court explained that the taxpayers' investment and their economic risk were directly connected with the production of the oil in place:

> Production and sale of the oil would result in its depletion and also in a return of capital investment to the parties according to their respective interests. The loss or destruction of the oil at any time from the date of the leases until complete extraction would have resulted in loss to the [taxpayers].

*Id.*

■ Subsequent courts have characterized *Palmer* as establishing a two-part test

5. Section 636(a) provides in pertinent part:
   A production payment carved out of mineral property shall be treated, for purposes of this subtitle, as if it were a mortgage loan on the property, and shall not qualify as an economic interest in the mineral property.

6. The regulation, 26 C.F.R. § 1.636–3(a)(1), provides:
   (a) *Production payment.* (1) The term "production payment" means, in general, a right to a specified share of the production from mineral in place (if, as, and when produced), or the proceeds from such production. Such right must be an economic interest in the mineral in place. It may burden more than one mineral property, and the burdened property need not be an operating mineral interest. Such right must have an expected economic life (at the time of its creation) of

shorter duration than the economic life of one or more of the mineral properties burdened thereby. A right to mineral in place which can be required to be satisfied by other than the production of mineral from the burdened mineral property is not an economic interest in mineral in place. A production payment may be limited by a dollar amount, a quantum of mineral, or a period of time. A right to mineral in place has an economic life of shorter duration than the economic life of a mineral property burdened thereby only if such right may not reasonably be expected to extend in substantial amounts over the entire productive life of such mineral property. The term "production payment" includes payments which are commonly referred to as "in-oil payments", "gas payments", or "mineral payments."

for determining whether there is an economic interest: (1) there must be an interest, acquired by capital investment, in the minerals in place; and (2) the return on the investment must be realized solely from the extraction of the minerals. *See Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347 (1956); *Rissler & McMurry Co. v. United States*, 480 F.2d 684, 686 (10th Cir.1973).[7]

■ Applying the *Palmer* test to this case, we conclude that OG & E's recoupment rights under the "take or pay" contracts do not give rise to an economic interest in the gas in place sufficient to amount to a production payment for Section 636(a) purposes.[8]

### A. Does OG & E Have an Interest in the Minerals in Place?

In order for OG & E's recoupment right to satisfy the first prong of the *Palmer* test, OG & E must have an interest in the gas in place. Whether there is an "interest" in minerals in place depends upon an evaluation of various factors, including: (1) the degree of legal interest in the minerals; (2) whether there is significant control over the mineral deposits; (3) the extent of contribution to the development or operation of the mineral extraction; (4) risk of loss; and (5) whether the interest is necessarily depleted as the mineral is extracted. *See, e.g., Tidewater Oil Co. v. United States*, 339 F.2d 633, 637, 168 Ct.Cl. 457 (1964) (discusses legal interest, control, and extent of contribution as factors), *citing* Sneed, *The Economic Interest—An Expanding Concept*, 35 Texas L.Rev. 307, 355 (1957); *Marathon Oil Co. v. Commissioner*, 838 F.2d 1114, 1125 (10th Cir.1987) (discusses risk as a factor); *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946) (discusses depletion as a factor). None of these factors is a *sine qua non* for satisfying the first prong of the *Palmer* test. Instead, they all should be considered in reaching an overall determination of whether an interest in the minerals in place has been created. In reviewing the five factors, we find that OG & E's recoupment right satisfies two of them.

As for the first factor, OG & E has no legal title or leasehold interest in the gas or the gas-producing property. In fact, the contracts state specifically that title to the gas passes from seller to buyer at the point of delivery, which occurs at the wellhead or at the outlet of the well separator, if any. Although the absence of title is not determinative, *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946), it is telling that the Supreme Court has found an economic interest in only one case where a fee or leasehold interest in the mineral property was lacking, *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

In *Southwest*, owners of uplands adjacent to certain offshore oil deposits contracted with a drilling company to allow the company to use their lands for whipstock drilling to reach the oil in return for a share of the company's profits. The Court held that the upland owners were entitled to a depletion allowance on the amounts received because they had a sufficient "economic interest" in the oil deposits. The Court based this conclusion on the fact that the use of the uplands was essential to the drilling operations because of the proximity of the lands to the deposits and because state law allowed offshore oil deposits to be reached only from drilling on these uplands. Thus, the *third* factor noted above —contribution to the development or operation of the mineral extraction—was promi-

---

7. Most cases analyzing the meaning of "economic interest" have arisen in the depletion context. Nevertheless, the economic interest concept also has been applied to decide whether a transaction is a sale or a lease in capital gains cases, *see United States v. White*, 401 F.2d 610, 613 (10th Cir.1968) (en banc), and is now one of the requirements for special tax treatment of production payments. *See* Treas.Reg. § 1.636-3(a)(1).

8. We address only whether a 636(a) production payment was generated by the excess payments made under these "take or pay" provisions, and we do not address other ways in which production payments may be generated.

nently met in *Southwest.* The Court was careful to limit its holding to those facts:

> We decide only that where, in the circumstances of this case, a party essential to the drilling for and extraction of oil has made an *indispensable* contribution of the use of real property adjacent to the oil deposits in return for a share in the net profits from the production of oil, that party has an economic interest which entitles him to depletion on the income thus received.

*Id.* at 317, 76 S.Ct. at 400 (emphasis added).

Unlike the upland owners in *Southwest,* OG & E has not met the third factor by contributing to production of the gas or operation of the gas wells. OG & E certainly provided no property or interest that necessarily contributed to production. Instead, its role essentially was one of a customer or buyer of the gas rather than as a producer of the gas. *See* Part II.B below.

With regard to the second factor, we conclude that OG & E does appear to have significant control over the minerals although, as we show later, its control is in the nature of a buyer's contractual rights rather than as a producer of the gas. The Tax Court based its conclusion that OG & E had an economic interest largely on its finding that OG & E had the contractual power to control production. *Freede,* 86 T.C. at 350. The court noted that OG & E could require the sellers to maintain "deliverability" at 125% of the minimum daily contract quantity and could compel the sellers to deliver gas into the pipeline at the "maximum rate" of production that, in the seller's sole judgment, would not damage the wells or decrease ultimate recovery.[9]

On the other hand, our reading of the contracts reveals that there are a number of important limitations on OG & E's powers over production. First, as Taxpayers concede, the sellers' agreements to maintain deliverability of gas equal to 125% of the daily contract quantity is, under the definitions set forth in the contracts, merely an obligation to maintain deliverability of 100% of what the seller chooses to "ma[k]e available" to the buyer.[10] Thus, this provision by itself does not give OG & E control over the amount of production. Rather, the *seller* has control over this amount in the first instance.

Second, although the contract does allow OG & E to compel production at the "maximum rate at which said wells are capable of producing," this is only an "all or nothing" type of control. Moreover, the seller has the right to determine the maximum rate such that production will not damage the wells and will not decrease the ultimate amount of gas which can be recovered from the wells.[11] The contracts also allow the sellers to abandon wells if they determine that the wells are not capable of producing gas in paying quantities. In addition, the seller has the right to sell the gas to others to protect its reservoir against unequal drainage if OG & E is not able to take delivery of sufficient gas to prevent unequal drainage.

Although OG & E certainly does not have unfettered control, we conclude under

9. "Deliverability" is contractually defined as "the volume of gas attributable to Seller's gas reserves actually delivered to Buyer at the point of delivery against the required delivery pressure during the twenty-four hour period following delivery of gas at the maximum rate of flow from Seller's well against the required delivery pressure for a period of three (3) days." The contract also provides that "[e]ither party hereto may request a determination of such deliverability upon giving the other party at least ten (10) days notice prior to the commencement of such test."

10. This is true because the seller has some control over the minimum contract quantity. The minimum average daily contract quantity is de-

fined in the contract as the *lesser* of 80% of deliverability against the required delivery pressure *or* 80% of the volume of gas *made available* by the seller to the buyer.

11. Although the contract leaves this determination to the seller's "sole judgment," it is likely that an implied requirement of reasonableness or good faith would limit the seller's power. *See, e.g., Garr–Woolley v. Martin,* 579 P.2d 206 (Okla.App.1978) (right under terms of oil and gas lease to remove all fixtures and machinery "at any time" construed as meaning "within a reasonable time"); 12A Okal.Stat.Ann. § 1–203 (good faith requirement under UCC). *See also Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267 (10th Cir.1988).

the contracts before us that OG & E at least possesses "significant" control.

The third factor concerning contribution to the development of the well is not met here, as discussed above.

The fourth factor—risk of loss—is satisfied here. Risk of loss often has been used as an indicia of an ownership interest. *See, e.g., Marathon Oil Co. v. Commissioner,* 838 F.2d 1114, 1125 (10th Cir.1987); *Christie v. United States,* 436 F.2d 1216, 1221 (5th Cir.1971). Here, we conclude that OG & E does bear a risk of losing its recoupment rights if anything were to happen to the property covered by the contracts such that production became inadequate to enable OG & E to recover its recoupment interest over and above the required minimum contract quantities. OG & E has no place to look for recovery of its recoupment interest except to production from the property.

The fifth factor, concerning whether OG & E's recoupment interest in the gas is "necessarily reduced" as production occurs, is not met here. That factor is typically used to determine an "economic interest" in the depletion context. *See Kirby Petroleum Co. v. Commissioner,* 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946); *Weaver v. Commissioner,* 72 T.C. 594, 600 (1979). OG & E fails to meet this factor because it has been stipulated that reserves exceed OG & E's right to take production, and hence the operator can produce gas from the well without "necessarily" reducing OG & E's recoupment interest. In fact, only if OG & E takes more than the minimum quantity in a given year and elects to use the excess to reduce its right of recoupment will its recoupment interest be diminished by production. Thus, it is possible that up to 20 years of production (the term of the contract) could pass without reducing the recoupment interest.

A consideration of the above factors does not lead us to any clear conclusion as to whether OG & E has an interest in the gas in place under the first prong of the *Palmer* test. A resolution of that issue would require an analysis of the weights to be given to the various factors upon the facts before us. Because we conclude, however, that OG & E's recoupment rights clearly fail the *second* prong of the *Palmer* test, we need not conduct such an analysis.

**B. *Does OG & E Look to Income Derived Solely From Extraction of the Mineral for Return of Its Investment?***

OG & E's recoupment right fails to meet the *second* prong of the *Palmer* test because OG & E has not made any investment in the gas-producing enterprise and certainly does not look to income derived solely from extraction of the mineral for the return of any investment. The economic reality is that OG & E's interest is merely that of a consumer paying for gas it receives at the wellhead, not an investor looking for profit from successful extraction. In other words, OG & E's interest is an "economic advantage" rather than an "economic interest" in the minerals in place.

This distinction was first set forth in *Helvering v. Bankline Oil Co.,* 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897 (1938), in which the Supreme Court differentiated between contractual advantages and capital investments:

> [T]he phrase 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit.

*Id.* at 367, 58 S.Ct. at 618.[12] In that case the Court held that a processor who had the contractual right to take wet gas from the wellheads and to extract and sell the gasoline therefrom, paying the well owners a share of the proceeds from the sales, had not acquired an economic interest in the gas in place but only an economic advan-

---

**12.** Treas.Reg. § 1.611–1(b)(1) contains a similar distinction between an economic interest and an economic advantage. It provides that "[a] person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production."

tage. The Court stated that "apart from its contracts with producers, respondent had no interest in the producing wells or in the wet gas in place. Respondent is a processor. It was not engaged in production." *Id.* at 367, 58 S.Ct. at 618.

We find that *Bankline* compels reversal here. Like the oil company in *Bankline*, OG & E has contractual rights to take delivery of gas at the wellhead for processing and future sale, but OG & E is not involved in the production of the gas and does not have any legal interest in the wells. Nor are OG & E's excess payments properly viewed as investments in the gas property. They are more like pre-determined damages payable to the producer for gas that was not taken as expected. The fact that those payments are not irretrievably lost but can be recouped by the purchaser out of excess production in later years does not convert them into an investment. Thus, OG & E's recoupment right entitles OG & E to a mere economic advantage and does not constitute an economic interest in the minerals in place. *See also Parsons v. Smith*, 359 U.S. 215, 224–26, 79 S.Ct. 656, 662–63, 3 L.Ed.2d 747 (1958); *Rissler & McMurry Co. v. United States*, 480 F.2d 684, 687 (10th Cir.1973).

Furthermore, OG & E is not seeking, through its recoupment right, a profit from the *extraction* of gas. One indication of an economic interest is the "possibility of profit" that is "dependent solely on the extraction and sale" of the mineral. *Burton–Sutton Oil Co. v. Commissioner*, 328 U.S. 25, 34–35, 66 S.Ct. 861, 866–67, 90 L.Ed. 1062 (1946); *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 604, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946).[13] OG & E, however, is not an investor seeking profit from gas production. Its excess payments do not entitle it to anything more than an amount of gas in subsequent years equivalent to that paid for but not taken in earlier years. If OG & E recovers its recoupment

gas in later years it will merely be taking late delivery of gas that it paid for earlier at the price agreed to by the parties. If it does not recover recoupment gas before the expiration of its contract, it will suffer a loss, not a profit. The "take or pay" obligation merely made OG & E a more attractive customer to the Taxpayers, not an investor in the property. OG & E's profit is derived solely from the remarketing of the gas to its customers downstream from production, and not from production itself.[14]

We conclude that OG & E's recoupment rights do not amount to an "economic interest" in the minerals in place because they do not satisfy the second prong of the *Palmer* test. Therefore, we hold that OG & E's excess payments did not create production payments for Section 636(a) purposes and thus should be included in Taxpayers' income in the year received.

REVERSED.

---

13. *See also S.E.C. v. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946) (defining "investment contract" in the securities context as a "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party").

14. Additional evidence of OG & E's consumer status are contractual provisions which give it the ability to reject and refuse to pay for gas that does not meet quality specifications.