SAN JUAN BASIN CONSORTIUM, LTD., a Colorado limited partnership, WS & DM, Inc., a Colorado corporation, and Methwan Corporation, a Colorado corporation, Plaintiffs,

v.

ENERVEST SAN JUAN ACQUISITION LIMITED PARTNERSHIP, a Texas limited partnership, EnerVest Management Company, L.L.C., a Texas limited liability company, and EnerVest San Juan Operating, L.L.C., a Delaware corporation, Defendants.

No. Civ.A. 97–B–2710.

United States District Court,
D. Colorado.

Oct. 18, 1999.

Peter A. Bjork, John P. Baker, Bjork, Lindley & Danielson, PC, Denver, CO, for Plaintiffs.

Keith D. Tooley, Brian S. Tooley, Welborn Sullivan Meck & Tooley, PC, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants, EnerVest San Juan Acquisition Limited Partnership ("ESJA"), EnerVest Management Company, LLC ("EMC"), and EnerVest San Juan Operating, LLC ("ESJO") (collectively, "EnerVest" or "Defendants"), move for partial summary judgment, pursuant to Rule 56, on Plaintiffs' claim for declaratory judgment. Plaintiffs, San Juan Basin Consortium, Ltd. ("SJBC"), WS & DM, Inc. ("WS & DM"), and Methwan Corporation ("Methwan") (collectively, the "San Juan Group" or "Plaintiffs"), oppose the motion and file a cross-motion for partial summary judgment regarding the same claim. EnerVest also moves for partial summary judgment on the San Juan Group's claims of quiet title, unjust enrichment, conversion, and theft. The San Juan Group opposes these motions. The motions are adequately briefed and oral argument will not materially aid their resolution. I grant, as set forth below, EnerVest's motion for summary judgment on the San Juan Group's declaratory judgment claim and accordingly deny the San Juan Group's cross-motion. I deny EnerVest's motion for summary judgment on the San Juan Group's quiet title claim. Finally, I grant EnerVest's motion for summary judgment upon the San Juan Group's claims of unjust enrichment, conversion, and theft. Jurisdiction exists under 28 U.S.C. § 1332.

### I.

The following facts are relevant to my determination of the motions and cross-motions for summary judgment. This case involves contracts concerning the production of methane gas from a coal seam under lands located in La Plata County, Colorado, within the exterior boundaries of the Southern Ute Indian Reservation.

### A. The 44 Canyon Agreement

On December 21, 1987, Plaintiff WS & DM, the managing general partner of Plaintiff SJBC, entered into a contract, known as the "44 Canyon Agreement," with Bowen/Edwards Associates, Inc. ("BEA"). In that agreement, BEA offered to sell WS & DM working and net revenue interests in the "Prospect Area." Under the terms of the agreement, BEA would earn 20% "back-in" working and net revenue interests after "payout" of wells drilled in the Prospect Area. (Complaint ¶¶ 16, 23). "Payout" occurs when the working interest owners who participate in the costs of drilling and completing a well (the "consenting owners") recoup the costs and expenses of drilling and completing that well. Only then are the owners who chose not to contribute to these initial costs (the "non-consenting owners") entitled to be "back-in" among the other owners and take and sell gas production and share in the expenses and revenues associated with the well. (Nelson Affidavit, ¶ 3).

### B. The Additional Acreage Agreement

On May 2, 1988, WS & DM and BEA entered into a second contract, known as the "Additional Acreage Agreement." EnerVest contends that although this contract is dated May 2, 1988, it was not signed until September 26, 1988. Pursuant to the Additional Acreage Agreement, BEA acknowledged that it had previously provided acreage leaseblocks to WS & DM "specifically identified by prospect name and approximate acreage as follows: ... BEA 44 Canyon Prospect ..." BEA also agreed that "[t]he separate, prior written agreements referred to above will remain in full force and effect." The Additional Acreage Agreement provides that "BEA ... will promptly undertake, with due diligence and best efforts, to secure and pres-

ent to WS & DM proposals and agreements for the acquisition of Additional Acreage Leaseblocks ('Prospects'), which Prospects WS & DM may reject or accept in its sole discretion." Under the Additional Acreage Agreement, BEA would earn only 2.6875% "back-in" working and net revenue interests upon "payout" of wells drilled in Prospects presented by BEA and accepted by WS & DM, as opposed to the 20% BEA reserved in the 44 Canyon Agreement. (Complaint ¶¶ 17, 23). EnerVest vigorously contends that the Additional Acreage Agreement was never recorded in the La Plata County real property records at any time relevant to this action. (Answer and Counterclaims, ¶ 8).

### C. The Decker Lease Assignment

The San Juan Group alleges that in 1990, BEA acquired an assignment of a portion of "the Decker Lease." The San Juan Group also contends that BEA, WS & DM, and SJBC agreed that the interests conveyed by the Decker Lease Assignment would be owned by the parties in accordance with the 44 Canyon Agreement and the Additional Acreage Agreement, as applicable. (Complaint ¶ 18). Because the San Juan Group contends that lands in the Decker Lease are governed by the Additional Acreage Agreement, it argues that BEA was entitled to the lesser percentage ownership provided in that contract. EnerVest contends, on the other hand, that the 1990 acquisition of the Decker Lease was only a formalization of an actual assignment that had taken place in August 1988, before the Additional Acreage Agreement was in effect and, therefore, the higher percentages in the 44 Canyon Agreement should apply.

The Decker Lease included an oil and gas leasehold for sections 4 and 5 of Township 32. ("the Sections 4 and 5 lands"). (Complaint ¶ 18). The San Juan Group contends that the Sections 4 and 5 lands are not within the parameters of the Prospect Area as defined by the 44 Canyon Agreement. Nor are the Sections 4 and 5 lands within the region known as the "44

Canyon" and, therefore, the San Juan Group contends that those lands are governed by the Additional Acreage Agreement, not the 44 Canyon Agreement. (Complaint ¶ 19). However, EnerVest contends that the parties to the 44 Canyon Agreement, including SJBC, acknowledged that the leasehold interests in Sections 4 and 5 were owned in proportion to the parties' respective interests in the 44 Canyon Agreement, not the Additional Acreage Agreement.

WS & DM conveyed its interest in the Decker Lease to SJBC, which, in turn, sold part of the interest to the Phelps–Tointon Group. The Phelps–Tointon Group later sold its interest back to BEA. The interest sold by the Phelps–Tointon Group to BEA is not at issue. (Complaint ¶ 20).

### D. The BEA–Emerald Assignment

In December 1991, BEA assigned all of its interests in the Sections 4 and 5 lands to Emerald San Juan Company ("Emerald") ("the BEA–Emerald Assignment"), the predecessor in interest to EnerVest. The BEA–Emerald Assignment made no mention of WS & DM, SJBC, or their alleged interests in the Sections 4 and 5 lands. Although the San Juan Group contends that the Sections 4 and 5 lands are governed by the Additional Acreage Agreement (with a 2.6875% back-in for BEA) and not the 44 Canyon Agreement (with a 20% back-in for BEA), (Complaint ¶¶ 19, 23), the BEA–Emerald Assignment states that it is "made pursuant to and subject to that certain 44 Canyon Participation and Subscription Agreement." (Complaint ¶ 21).

### E. The Emerald–SJBC Assignment

In October 1994, Emerald assigned to SJBC ("the Emerald–SJBC Assignment") the following interests in the Sections 4 and 5 lands: (1) " 'an undivided 26.81036% working interest from the surface of the earth to and including the base of the Fruitland Formation;' " and (2) " 'an undi-

vided 85.00000% working interest (to be adjusted after payout) from the base of the Fruitland Formation to and including 100 feet below the base of the Fruitland Formation.' " Although the working interests conveyed by the Emerald–SJBC Assignment are conceded as accurate, the San Juan Group alleges that the assignment does not correct the misstatement in the BEA–Emerald Assignment, that it was purportedly "made pursuant to and subject to that certain 44 Canyon Participation and Subscription Agreement." (Complaint ¶ 21). Emerald is EnerVest's predecessor in interest. Therefore, Emerald's interests eventually inured to EnerVest.

### F. Ratification and Joinder to Operating Agreement

Concurrently with the October 1994 Emerald–SJBC Assignment, Emerald and SJBC entered into a separate agreement regarding the Amax Suit # 5–5 Well, which states, in relevant part: "SJBC agrees that the interest which it has been assigned ... in and to the Well was granted and accepted with the understanding that SJBC will be treated as a 'non-consenting owner' within the context of the provisions of Section 34–60–116(b)(1) and (b)(11) of the Colorado Revised Statutes...." (Complaint ¶ 25).

### G. The Subject Wells

Two coalbed methane gas wells, the "Meridian # 401" (a/k/a Burlington Resources # 401) and the "Amax Suit # 5–5" (a/k/a Cedar Ridge SU # 5–5) (collectively, "the Subject Wells"), are the wells at issue in this case. The Meridian # 401 is located on Section 4 lands, was drilled on October 28, 1991, and is 50% owned and wholly operated by Burlington Resources Oil and Gas Company. The Amax Suit # 5–5 is located on Section 5 lands, was drilled on September 15, 1992, and is wholly operated by Cedar Ridge LLC, which likewise owns an undisputed 50% working interest in that well. SJBC and EnerVest, together, own the remaining 50% working interests in both wells, but

dispute the percentages of their respective interests. (Complaint ¶ 10).

SJBC did not participate or contribute a proportionate share of the drilling and completion costs of the Subject Wells and, consequently, became a "nonconsenting owner" under C.R.S. § 34–60–116(7)(b) whose interest was subject to statutory penalties. Thus, SJBC is entitled to receive production revenues only after "payout," which occurs when the consenting owners recoup their initial costs and statutory penalties. (Complaint ¶ 9; Sched. Ord. of 8/4/98 at 3). Both of the Subject Wells have concededly reached "payout." (Complaint ¶ 10). However, there is a dispute as to when payout on the Amax Suit # 5–5 occurred. The San Juan Group claims that payout occurred in May 1994 while EnerVest claims that payout did not occur until July 1996.

### H. Section 29 Tax Credits

Because the Subject Wells are coalbed methane gas wells, the owners qualify for valuable tax credits under the Internal Revenue Code, 26 U.S.C. § 29 ("Section 29 Credits"). (Complaint ¶ 13). The San Juan Group argues that the Subject Wells would not have been drilled absent the tax credits. (Moore Affidavit, p. 2). Indeed, the value of Section 29 Credits often equal or exceed the anticipated net sales of the gas itself. (Cain Affidavit, p. 3). Section 29 was enacted to encourage the development of nonconventional fuels by creating a valuable tax credit:

> Exploration of the legislative history ... reveals the congressional intent to encourage the development of alternative sources of energy. In its 1979 report to Congress, the Senate Finance Committee stated its belief that "a tax credit for the production of energy from alternative sources will encourage the development of these resources ... These alternative energy sources typically involve new technologies, and some subsidy is needed to encourage these industries to develop to the stage where

they can be competitive with conventional fuels." S.Rep. No. 96–394 at 87 (emphasis added), 1980 U.S.C.C.A.N. at 496.... Congress contemplated providing an incentive for the development of new technologies that would facilitate the production of alternative fuel sources. This view is reinforced by the House and Senate conference committee report, which states that "[t]his provision is intended to provide producers of alternative fuels with protection against significant decreases in the average wellhead price for the uncontrolled domestic oil, with which alternative fuels frequently compete." H.Conf.Rep. No. 817, at 139, reprinted in 1980 U.S.C.C.A.N. 691.

*Shell Petroleum, Inc. v. United States,* 996 F.Supp. 361, 367 (D.Del.1997).

### I. Contentions

It is undisputed that: (1) payout has occurred for each of the Subject Wells; (2) the Subject Wells have continued to produce since payout; (3) the 20% back-in after payout to be earned by BEA under the 44 Canyon Agreement is greater than the 2.6875% back-in after payout to be earned by BEA under the Additional Acreage Agreement; and (4) BEA's interests are now wholly owned by EnerVest. The San Juan Group and EnerVest dispute when payout occurred on the Amax Suit # 5–5, the value of production attributable to payout calculations, and the percentage working interest and net revenue interest owned by SJBC and EnerVest after accounting for the back-in after payout. (Complaint ¶ 11, 23). The San Juan Group claims that EnerVest: (1) in violation of Colorado law, failed to provide required reports to SJBC concerning the costs, revenues, and payout status; (2) did not advise Cedar Ridge of SJBC's. interest in the Subject Wells; (3) withheld from SJBC its share of methane gas produced after payout or failed to pay SJBC its share of proceeds from methane gas produced and sold after payout; and (4) manipulated several million dollars in federal tax cred-

its to the detriment of SJBC's interests. (Sched. Ord. of 8/4/98 at 3).

EnerVest contends that because the Additional Acreage Agreement between WS & DM and BEA was not recorded, EnerVest had no knowledge of its terms. EnerVest is a successor in title to Emerald and argues that it should not be bound by unrecorded agreements of which it has no knowledge. Emerald was a bona fide purchaser for value and acquired BEA's interests in the Sections 4 and 5 lands under the Decker Lease free of any claim by SJBC that BEA's interests were subject to the terms of the unrecorded Additional Acreage Agreement. At the time Emerald assigned its interests to EnerVest, the Additional Acreage Agreement was still not recorded in La Plata County and EnerVest was therefore not on record notice. EnerVest allegedly relied on record title and the San Juan Group allegedly failed to properly "clean up" the chain of title to reflect the Additional Acreage Agreement and its alleged effect on the Sections 4 and 5 lands. Furthermore, EnerVest contends that subsequent documents between the parties refer to the Sections 4 and 5 lands as subject to the 44 Canyon Agreement and not the Additional Acreage Agreement. Finally, EnerVest contends that in October 1996, after EnerVest acquired the Sections 4 and 5 lands from Emerald, W. Scott Moore, president of WS & DM, filed an affidavit with La Plata County clouding and slandering EnerVest's title and stating that such lands were subject to the Additional Acreage Agreement. (EnerVest's Answer and Counterclaims).

The San Juan Group contends that, pursuant to the Additional Acreage Agreement, SJBC owns a 13.04492% working interest and a 8.96839% net revenue interest in each of the Subject Wells after payout. EnerVest avers that, pursuant to the 44 Canyon Agreement, SJBC owns a 10.72414% working interest and a 7.37285% net revenue interest in each of the Subject Wells after payout. (Complaint ¶ 24). Accordingly, the disputed in-

terest is a 2.32078% working interest and a 1.59554% net revenue interest in each of the subject wells.

The San Juan Group commenced this action on December 23, 1997, alleging nine claims for relief. (1) breach of contract (two counts); (2) quiet title; (3) declaratory relief; (4) unjust enrichment; (5) interference with prospective business advantage; (6) slander of title; (7) conversion; (8) theft; and (9) accounting. (Complaint at 12–25). The San Juan Group's fifth claim for interference with prospective business advantage was dismissed by this Court as moot. On May 28, 1999, EnerVest filed its Answer and Counterclaims to the San Juan Group's Complaint. Its counterclaims against the San Juan Group are: (1) violation of C.R.S. § 38–35–109(3) for filing a false affidavit; (2) estoppel by deed; and (3) an alternative claim for negligent misrepresentation. EnerVest, in three separate motions, moves for summary judgment on the San Juan Group's second, third, fourth, seventh, and eighth claims for relief. The San Juan Group has made a cross-motion for summary judgment on its third claim for a declaratory judgment. Trial is scheduled to commence January 31, 2000.

## II.

Various motions and cross-motions for summary judgment have been filed in this case, having the potential to affect five of the San Juan Group's original nine claims for relief. The purpose of a summary judgment motion is to assess whether trial is necessary. See White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir.1995). Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The non-moving party has the burden of showing that issues of undetermined material fact exist. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the ini-

tial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. See Celotex, 477 U.S. at 323, 106 S.Ct. 2548; Mares v. ConAgra Poultry Co., Inc., 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. Rule 56(e); see also Otteson v. United States, 622 F.2d 516, 519 (10th Cir.1980). These facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." Celotex, 477 U.S. at 324, 106 S.Ct. 2548. Where, as here, the parties file cross-motions for summary judgment, I assume that no evidence need be considered other than that filed by the parties. Nevertheless, summary judgment is inappropriate if disputes remain as to material facts. See James Barlow Family Ltd. Partnership v. David M. Munson, Inc., 124 F.3d 1321, 1323 (10th Cir.1997).

Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. See Anderson, 477 U.S. at 252, 106 S.Ct. 2505; Mares, 971

F.2d at 494. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White* at 360 (citations omitted), as are conclusory assertions that factual disputes exist. *See Anderson,* 477 U.S. at 247, 106 S.Ct. 2505.

### III.

The San Juan Group and EnerVest cross-move for partial summary judgment on the San Juan Group's declaratory judgment claim. The San Juan Group asks me to declare that payout occurred on the Amax Suit # 5–5 well in May 1994. EnerVest contends that payout occurred in July 1996. The motions do not address the Meridian # 401. The time of payout is relevant in dictating when a non-consenting owner, such as SJBC, begins to receive revenue from the well. Ultimately, the San Juan Group's claim requires me to decide whether the value of Section 29 Credits claimed by consenting owners should be taken into account in determining when payout occurs under C.R.S. § 34–60–116(7). The San Juan Group's allegation that payout occurred in May 1994 takes into account the value of Section 29 Credits to the consenting owners.

The 1994 written agreement between SJBC and EnerVest's predecessor in interest provides that:

> SJBC did not participate in the drilling and completion of [the Amax Suit # 5–5 well] and that SJBC has not contributed its proportionate share of the drilling and completion costs for that well as a working interest owner. Consequently, SJBC agrees that … SJBC will be treated as a "non-consenting owner" within the context of the provisions of Section 34–60–116(b)(I) and (b)(II) of the Colorado Revised Statutes as regards the recovery of costs, expenses and penalties provided in that statute from SJBC by the working interest owners who did participate in the drilling and completion of the Well.

(October 1994 Agreement, ¶ 2). It is undisputed that the reference to C.R.S. § 34–60–116(b)(I) and (b)(II) is, in fact, a reference to C.R.S. § 34–60–116(7)(b)(I) and (b)(II).

Colorado Revised Statute § 34–60–116 provides that if a working interest owner decides not to bear his proportionate share of the costs and risks of drilling and completing a well, thereby becoming a nonconsenting owner, the consenting owners are entitled to receive the nonconsenting owners' share of production until the consenting owners have recouped the costs. The point at which consenting owners have recovered such costs from the production is "payout." At this time, and not before, non-consenting owners can begin to receive revenue from the well. The relevant portions of this statute state:

> (7)(a) … [A]s to each nonconsenting owner who refuses to agree to bear his proportionate share of the costs and risks of drilling and operating the well, the order shall provide for reimbursement to the consenting owners who pay for the drilling and operation of the well of the *nonconsenting owner's share of the costs and risks of such drilling and operating out of, and only out of, production from the unit representing his interest,* excluding royalty or other interest not obligated to pay any part of the cost thereof. In the event of any dispute as to such costs, the commission shall determine the proper costs as specified in paragraph (b) of this subsection (7). The order shall determine the interest of each owner in the unit and shall provide that each consenting owner is entitled to receive, subject to royalty or similar obligations, the share of the production of the well applicable to his interest in the drilling unit and, unless he has agreed otherwise, his proportionate part of the nonconsenting owner's share of such production until costs are recovered and that each nonconsenting owner is entitled to own and to receive the share of the production applicable to his interest in the unit after the consenting owners have recovered the nonconsenting owner's share out of production.

(b) Upon the determination of the commission, proper costs recovered by the consenting owners of a drilling unit *from the nonconsenting owner's share of production* from such a unit shall be as follows:

(emphasis added). Sections 34–60–116(7)(b)(I) and (b)(II) go on to list specific types of recoupable costs. Nowhere are income taxes, including tax credits, of any kind mentioned. Section 34–60–116(8) then specifies the types of information the well operator is required to provide a non-consenting owner for purposes of determining payout. The operator is required to provide the non-consenting owner with "a monthly statement of all costs incurred together with the quantity of oil or gas produced and the amount of proceeds realized from the sale of production during the preceding month." There is no requirement that the operator provide the non-consenting owner with income tax information of any kind.

Section 29 Credits are income tax credits. As such, whether a taxpayer claims Section 29 Credits depends upon the taxpayer's individual income tax situation. Section 29 allows a taxpayer, under certain circumstances, to claim a credit against income tax liability if the taxpayer has an economic interest in the production of qualifying non-conventional fuels such as coalbed methane gas. These credits come with many limitations and are not automatically available to a taxpayer simply because the taxpayer has an economic interest in the production of a qualifying fuel. Section 29 Credits are granted under the Internal Revenue Code:

§ 29. Credit for producing fuel from a nonconventional source

(a) Allowance of credit.—There shall be allowed as a credit against the tax imposed by this chapter for the taxable year an amount equal to—

(1) $3, multiplied by

(2) the barrel-of-oil equivalent of qualified fuels—

(A) sold by the taxpayer to an unrelated person during the taxable year, and

(B) the production of which is attributable to the taxpayer.

26 U.S.C. § 29. This general section is followed by numerous sections addressing technical limitations and adjustments.

In the 1994 agreement, SJBC contracted to be treated as a non-consenting owner pursuant to Colorado's statute "as regards the recovery of costs, expenses and penalties provided in that statute from SJBC by the working interest owners who did participate in the drilling and completion" of the Amax Suit # 5–5. Both parties point to this relevant contractual language in support of their arguments for and against including Section 29 Credits in the determination of payout. The San Juan Group contends that the Colorado statute referenced in the 1994 agreement, and excerpted above, should be read to allow this inclusion. Specifically, Plaintiffs point to the statute's language that consenting owners will be reimbursed for the costs "from the nonconsenting owner's share of production." C.R.S. § 34–60–116(7)(b). The San Juan Group argues that Section 29 Credits should be included within the share of production because of their substantial value to consenting owners. It supports this contention by noting that later in the statute, when addressing what information an operator of a well shall furnish a non-consenting owner, the statute specifically lists "the amount of proceeds realized from the sale of production." C.R.S. § 34–60–116(8). The San Juan Group contends that because the authors of the statute knew to specify "proceeds" in the later section of the same statute, when they specified "share of production" in the relevant section they meant to include more than mere proceeds. I disagree with this interpretation of the statute.

█ It is conceded that non-consenting owners, prior to payout, are not entitled to the benefit of Section 29 Credits. The San

Juan Group concedes that, "Section 29 expressly provides that only owners of property who have a right to share in production may earn Section 29 tax credits. So long as the Plaintiffs are non-consent, and they cannot take their share of production, they cannot earn Section 29 tax credits." (Plaintiffs' Summary Judgment Brief, fn 6). Section 29 Credits were developed as an incentive to promote the development of non-conventional fuels. The Senate Finance Committee Report stated:

> The Committee believes that a tax credit for the production of energy from alternative sources will encourage the development of these resources by decreasing the costs of their production relative to the cost of imported oil.

S.Rep. No. 96–394, 96th Cong., 1st Sess. 87 (1979); *Royalty Consequences of Nonconventional Fuel Tax Credits under Section 29 of the Internal Revenue Code*, United States Department of the Interior, Dec. 8, 1993. The benefits of Section 29 Credits are given only to consenting owners because they assume the risk of fronting the capital necessary to begin the mine or well. Because the non-consenting or "carried" parties do not own an economic interest in production until payout, the consenting owners are responsible for all taxes due on any income derived from production. It follows, then, that these consenting parties are also entitled to the associated income tax benefits from production. The income tax that consenting owners must pay on income derived from production and sale of natural gas are as much of a part of the costs of production as income tax credits are a benefit derived from the production of that resource. The San Juan Group does not suggest that EnerVest should deduct its income taxes from the payout calculation. Plaintiffs are myopic in asserting that I focus on only one side of the ledger. I hold that neither the cost nor benefit of taxes should be taken into account when determining payout. *See Waller Bros., Inc. v. Exxon Corp.*, 836 F.Supp. 363, 371 (S.D.Miss.1993) ("A nonconsent penalty is 'designed to ensure that nonparticipating owners do not benefit from the

successful outcome of risks they do not take.'") (internal citations omitted).

■ In describing the carried and non-carried interests in a mining operation, the Fifth Circuit states:

> In any carried interest transaction, one of the owners of the working interest in property is willing to advance the funds necessary for drilling of wells and development of production of oil or gas, and to look only to the other owner's share of production for the other owner's contribution to such costs. *The party who puts up the money is called the carrying party because he risks his entire investment against the possibility that there will not be enough production to reimburse him for his costs. The other party is called the carried party because he takes no risks.* The carried party agrees to wait until the carrying party has recouped his drilling and development costs out of production before he takes any payments on his share. The carried party is not personally liable for any costs and loses nothing if there is no production.

*United States v. Cocke*, 399 F.2d 433, 436 (5th Cir.1968) (en banc) (emphasis added). That court explains that, "during the period of the recoupment the carried party ... gets no income and no deductions for depletion or depreciation, and that all income and deductions go to the carrying party." *Id.* No income retained by a carrying party is taxable to the carried party. *See id.* at 438–445. The Fifth Circuit persuasively holds that income from the mines or wells is taxable only to the party who bears the risks and costs to produce the oil and gas, and likewise tax deductions for such costs can be taken only by the party who actually paid or incurred them:

> The argumentative justification for liberality in taxation of oil and gas is that such liberality encourages and emboldens the fiscally timid to exploit the resource. It rewards the risktaker. Here [the consenting party] risked the exploration and development costs. If

tax emoluments are to be granted, it would be cynicism in the name of economic bravery to give the tax break to the economic observer .... as the spoils go to the victor, so these deductions go to the rightful depleter.

*Id.* at 452.

In adopting the Fifth Circuit's opinion in *Cocke,* the Tenth Circuit states that, "title ownership is not controlling. Rather, the economic risk of development is most important. *Cocke* clearly implied that the deductions were available to Humble as the party which paid them and bore the risk of loss." *Marathon Oil Co. v. Comm'r of Internal Revenue,* 838 F.2d 1114, 1124 (10th Cir.1987). In relation to deductions, the Tenth Circuit states:

the party who bears the economic risks associated with the operating interest in an oil and gas lease must also be entitled to claim the deductions associated with that interest, whether or not that party possesses the legal or equitable title to the lease.

*Id.* at 1125.

The Tenth Circuit's reasoning in *Marathon Oil* applies equally to Section 29 Credits. Tax deductions have the same income tax effect as Section 29 Credits. "Whether the law allows an expense to be deduced against income before computing tax or allows a credit against a tax after it is computed is immaterial; the effect of reducing the levy imposed is the same." *Royalty Consequences of Nonconventional Fuel Tax Credits,* Department of the Interior, Dec. 8, 1993. Section 29 Credits were designed as an incentive to those who bear the economic risk of producing non-conventional fuels. To allow a non-consenting owner to share in the income tax benefits offered to those who undertake the risk creates a disincentive to development. If there is never any production, the non-consenting owner has no obligation for the costs. If there is production, those who assumed the economic risk are both responsible for any taxes owed and entitled to all income tax benefits. SJBC did not incur any risk nor any income tax obligations on income derived from production before payout. Therefore, I conclude that the San Juan Group is not entitled to any of the associated income tax benefits. EnerVest, the risk taking party, should not be penalized for the income tax benefits it received in reward for its risk-taking. *Marathon Oil* confirms that SJBC must participate in the risks of drilling a well in order to take advantage of any resulting income tax benefits. Because SJBC elected to be treated as a non-consenting owner, it cannot now indirectly share in the benefits of Section 29 Credits.

Furthermore, the record reflects that the San Juan Group did not actually anticipate that Section 29 Credits would be taken into account in the calculation of payout. For example, the Amax Suit # 5–5 well was drilled on September 15, 1992. (Moore Affidavit, p. 1). The agreement by which SJBC agreed to be treated as a non-consenting owner in the well was executed by SJBC on October 19, 1994. (Complaint ¶ 25). The San Juan Group now contends that payout occurred in May 1994, almost five months before signing the agreement. As the San Juan Group notes, Section 29 Credits have a large economic value. A partial reason for the agreement was that the Defendants, as consenting owners, could realize this value. Also, in a 1987 letter agreement between SJBC and BEA, W. Scott Moore, the president and managing general partner of the Plaintiffs, authored an unrelated express agreement to include Section 29 Credits in the calculation of payout. He stated that, "BEA shall receive half of its 20% back-in working interest ... after partners have *reached payout under a standard industry definition of payout* **but** *including the value of any tax credits received by the partners.*" (Dec. 22, 1997, letter from W. Scott Moore) (emphasis added). This agreement tells me two things. First, although made in a different context than the present agreement, it demonstrates that Plaintiffs have the knowledge and background to structure such an express agreement but failed to do so in the 1994 agreement. Second, it

is a concession by Mr. Moore that the standard definition of payout does not include the value of tax credits since this provision is preceded by "but" and had to be expressly added.

Plaintiffs have cited no authority in which Section 29 Credits have been used to calculate payout. Likewise, their interrogatory responses reveal that they are not aware of a single occasion where such credits have been taken into account in this determination. (Plaintiffs' Response to Interrogatory No. 5, Exh. 3 to Defendants' Response to Plaintiffs' Cross Motion for Summary Judgment). In contrast, Defendants attach the affidavit of James Strickler, Senior Staff Landman for Burlington Resources Oil and Gas Company, in which he states that over the last ten years, Burlington has operated and owned an interest in hundreds of wells that produce coalbed methane, and he is not aware of a single occasion where Section 29 Credits have been taken into account in determining non-consent payout. (Strickler Affidavit, ¶ 3–6) ("It is well accepted industry custom and practice not to take into account income tax considerations such as the amount consenting owners may claim on their annual income tax returns for tax credits under Section 29 in calculating payout"). Jack Vaughn of EnerVest and Joseph Feiten of Price Waterhouse Coopers, LLP confirm this. (Vaughn Affidavit; Feiten Affidavit). The San Juan Group does not refute this evidence. *See* Rule 56(e); *see also Otteson,* 622 F.2d at 519 (once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried).

There are further practical difficulties with applying the theory the San Juan Group proposes. Under its theory, payout could not be determined until after the consenting owners file income tax returns and allocate a portion of the credit or liability to production from a given well. If the Section 29 Credits claimed by the consenting owner are more than the amount necessary to reach payout, the consenting owner would have wrongly claimed Section 29 Credits for portions of gas produced for which it did not own an economic interest. There are numerous, obvious flaws with this procedure, and this cannot be the result Congress intended. Furthermore, Section 29 Credits are not treated as revenue under generally accepted accounting principles. (Feiten Affidavit, ¶ 4). The Internal Revenue Service does not treat Section 29 Credits as revenue out of production. *See Rulings and Decisions Under the Internal Revenue Code of 1986,* Section 29, Rev.Rul. 94–98. Reduction of income tax through Section 29 Credits does not constitute part of the value of production for federal oil and gas royalty purposes. *See Royalty Consequences of Nonconventional Fuel Tax Credits,* Department of the Interior, Dec. 8, 1993 ("Credits against income taxes resulting from the production of qualified nonconventional fuels under Section 29 . . . are not part of the value of the production.").

Taking income tax credits into account in determining when payout occurs would lead to confusion, uncertainty, and inconsistencies. This absurdity cannot be the intent of the Colorado General Assembly. Section 29 Credits reduce income tax obligations. They are not revenue or proceeds out of production. The Amax Suit # 5-5 would not have been drilled but for consenting owners agreeing to pay the costs and take the risks. Section 29 Credits were designed to reward these risks. SJBC, as a non-consenting owner, elected not to take the risks and costs and should not indirectly benefit from Section 29 Credits. *Marathon Oil* dictates that the party bearing the costs and risks is entitled to associated tax benefits. 838 F.2d 1114. The same principle applies here. Accordingly, I grant EnerVest's motion for summary judgment on this declaratory judgment claim to the extent it implicates issues of Section 29 Credits.

**1224**

### IV.

EnerVest also moves for summary judgment on the San Juan Group's second claim for quiet title. This motion would require me to decide whether the 44 Canyon Agreement or the Additional Acreage Agreement governs the Sections 4 and 5 lands and the Subject Wells. EnerVest raises the affirmative defense that this claim is barred by the applicable statute of limitations giving the San Juan Group three years to bring this action. The San Juan Group concedes that the disputed interest accrued in 1990. (Plaintiffs' Opposition to Defendants Motion for Summary Judgment on Quiet Title, p. 53). However, it contends that an eighteen year limitations period applies to the facts of this case.

### A.

 In a diversity action based on Colorado state law, I must apply Colorado statutes of limitations. *See Gibraltar Cas. Co. v. Walters,* 185 F.3d 1103 (10th Cir. 1999) (applying Colorado statute of limitations in diversity case); *Cook v. G.D. Searle & Co.,* 759 F.2d 800, 803 (10th Cir.1985) (holding that federal courts are to apply both the state's statute of limitations and tolling rules in diversity actions). In Colorado, it is the nature of the right sued upon and not the form of action that determines the applicability of a particular limitations period. *See McDowell v. United States,* 870 P.2d 656, 660–661 (Colo.App. 1994); *Association of Owners, Satellite Apartment, Inc. v. Otte,* 38 Colo.App. 12, 550 P.2d 894, 896 (1976). Furthermore, where a statute of limitations is specifically drafted to relate to special cases, it controls. *See Otte,* 550 P.2d at 897.

The San Juan Group's claim for quiet title reads:

41. SJBC's ownership of working interests and net revenue interests in the Sections 4 and 5 lands and the Subject Wells are subject to and pursuant to the Additional Acreage Agreement, not the 44 Canyon Agreement, and therefore SJBC's working interests and net revenue interests after payout must be calculated based on the back-in provided in the Additional Acreage Agreement, not the 44 Canyon Agreement.

42. EnerVest improperly claims that its working interests and net revenue interests in the Sections 4 and 5 lands and in the Subject Wells are subject to and pursuant to the 44 Canyon Agreement, and improperly claims, therefore, that its working interests and net revenue interests after payout must be calculated based on the back-in provided in the Canyon Agreement.

(Complaint, ¶¶ 41–42). The Plaintiffs go on to pray for a complete adjudication of the rights of the parties to the disputed interests. SJBC specifically requests a determination of the percentages of its working interests and net revenue interests.

The San Juan Group argues that Colorado's limitations period applicable to quiet title actions involving disputes as to real property, such as a mineral estate, is C.R.S. § 38–41–101, providing an eighteen year limitations period. This statute provides, in relevant part:

No person shall commence or maintain an action for the recovery of the title or possession or to enforce or establish any right or interest of or to real property or make an entry thereon unless commenced within eighteen years after the right to bring such action or make such entry has first accrued or within eighteen years after he or those from, by, or under whom he claims have been seized or possessed of the premises. Eighteen years adverse possession of any land shall be conclusive evidence of absolute ownership.

In support of its contention that the eighteen year limitation period applies here, the San Juan Group cites Colorado caselaw. However, each of the cases cited involves adverse possession. *See, e.g., Kriss v. Mineral Rights, Inc.,* 911 P.2d 711 (Colo.App.1996) (applying eighteen year limitation period to claim of adverse possession).

■ The eighteen year limitations period in C.R.S. § 38–41–101 must be read in conjunction with the prescriptive period for adverse possessors, also eighteen years. *See Kroulik v. Knuppel*, 634 P.2d 1027 (Colo.App.1981) (a party asserting title to property by adverse possession must prove actual possession of the property during the statutory prescriptive period of eighteen years). The eighteen year limitations period defines the prescriptive period for adverse possession. Section 38–41–101 includes an express reference to the doctrine of adverse possession: "Eighteen years adverse possession of any land shall be conclusive evidence of absolute ownership." I conclude that the extended limitations period of eighteen years set forth in C.R.S. § 38–41–101 does not apply outside the context of an adverse possession claim.

EnerVest, on the other hand, affirmatively defends that Colorado's general limitation period for contract actions applies to this case. C.R.S. § 13–80–101(1)(a). This provision states, in relevant part,

> The following civil actions, regardless of the theory upon which suit is brought, or against whom suit is brought, shall be commenced within three years after the cause of action accrues, and not thereafter:
>
> (a) All contract actions, including personal contracts and actions under the "Uniform Commercial Code"
>
> ...

EnerVest contends that because I must consider the true nature of the claim brought by Plaintiffs in determining the applicable limitations period, I must recognize that the San Juan Group's quiet title claim is inherently based on specific contracts and their interpretation. Defendants assert that when the true nature of a claim is one to enforce a contract or seek a determination that a contract has been breached, the contract statute of limitations applies.

I agree with Defendants that the nature of the San Juan Group's "quiet title claim" is one to enforce EnerVest's alleged contractual obligations under the Additional Acreage Agreement. In essence, the San Juan Group is seeking a declaration that EnerVest's predecessor in interest breached its contractual obligations to SJBC by assigning interests expressly subject to the 44 Canyon Agreement and not the Additional Acreage Agreement. However, I disagree that C.R.S. § 13–80–101 is the correct limitations period to apply to this claim.

As noted above, Colorado law requires me to apply the most factually specific statute of limitations provision to a particular case. *See Bent v. Ferguson*, 791 P.2d 1241, (Colo.App.1990) ("since a more specific statute of limitations applies to this case, it, rather than the general equity statute of limitations, controls."); *Mohawk Green Apartments v. Kramer*, 709 P.2d 955, 957 (Colo.App.1985) ("If a statute of limitations is drafted to relate to special cases, it, rather than a general statute of limitations, controls."). The limitations period that EnerVest relies upon is not the most specific in light of the facts of this case. Instead, C.R.S. § 38–41–116, although never mentioned by either of the parties, is the most applicable statute. Therefore, EnerVest's reliance on the three year limitations period for general contract actions is misplaced.

■ Section 38–41–116 states, in relevant part:

> No action ... shall be brought ... by any person to enforce or procure any right or title accorded to the purchaser under any contract for the purchase and sale of real property if such person is not in possession of the real property ... unless such action or proceeding is commenced within ten years of the day or the happening of the event appointed in said contract for the delivery by the seller of a deed of conveyance of the property therein agreed to be purchased and sold. If no day is appointed in such contract for the delivery of such conveyance, then such action or proceeding shall be commenced within ten years of the day on which the last and final in-

stallment of the purchase price would have been paid but not thereafter.

Because the San Juan Group is trying to enforce its real property rights under the Additional Acreage Agreement and subsequent contracts assigning the rights to Sections 4 and 5 lands, this statute applies. In the single Colorado case to apply this statutory provision, *Bent v. Ferguson*, 791 P.2d 1241 (Colo.App.1990), the Colorado Court of Appeals found that it applied to a quiet title action based on a contractual transfer of real property. The Court found that C.R.S. § 38–41–101, providing the eighteen year limitations period, was not the most appropriate statute of limitations. The Court stated: "In our view, plaintiff, as a purchaser not in possession, is attempting to enforce his right or title pursuant to the contract of sale, and accordingly, this statute is controlling." *Bent*, 791 P.2d at 1243. The same reasoning applies here. The affirmative defense of statute of limitations is one that can be waived by a defendant. *See United States v. Gallup*, 812 F.2d 1271, 1280 (10th Cir. 1987) ("It is well settled that the statute of limitations is an affirmative defense which is waived unless raised at trial."); *Zertuche v. Montgomery Ward & Co., Inc.*, 706 P.2d 424, 426 (1985) ("The statute of limitations is an affirmative defense which is waived unless affirmatively pleaded."). Because EnerVest failed to raise the applicable statute of limitations, this defense is waived.

**B.**

EnerVest moves for partial summary judgment on the San Juan Group's quiet title action for the following substantive reasons. EnerVest contends that the subject interests in the Sections 4 and 5 lands are controlled, as a matter of law, by the 44 Canyon Agreement, estoppel by deed precludes the claim, and EnerVest's predecessor in title (Emerald) was a bona fide purchaser and EnerVest succeeded to its bona fide purchaser status. I cannot grant summary judgment on the San Juan Group's quiet title claim because I find

that it involves genuine issues of disputed material fact.

■ The San Juan Group raises disputed issues of material fact regarding Emerald's status as a bona fide purchaser, whether Emerald was on actual or constructive notice of the Additional Acreage Agreement, and whether Emerald was even a purchaser "for value." The San Juan Group also raises issues of fact with regard to whether the 44 Canyon Agreement or the Acreage Acquisition Agreement controls the disputed interests. Finally, Plaintiffs raise issues of material fact with respect to whether recitals in the previous deeds were included through mistake, thereby precluding estoppel by deed. *See, e.g., Dennett v. Mt. Harvard Development Co.*, 43 Colo.App. 422, 604 P.2d 699, 701 (1979) ("The doctrine[ ] of … 'estoppel by deed' ha[s] never prevented the reformation of a deed in which the words of description or of conveyance fail to describe correctly or to convey the land or interest that was agreed upon.") (citing 3 A. Corbin, Contracts, § 604 at 631 (1963)); *Regan v. Customcraft Homes, Inc.*, 170 Colo. 562, 463 P.2d 463, 464 (1970) ("By the acceptance of a deed *in the absence of fraud or mistake* … the grantee is bound by the provisions thereof the same as if he too had signed the deed."); *International Trust Co. v. Palisade Light, Heat & Power Co.*, 60 Colo. 397, 153 P. 1002, (1916) ("Not every statement in a deed … binds parties to it by way of estoppel. To render a statement effective as an estoppel it must appear that it was made of some matter which is thus settled as a fact."). Because genuine, disputed issues of material fact surround the Plaintiffs' quiet title claim, I deny summary judgment.

**V.**

Finally, EnerVest moves for summary judgment on the San Juan Group's fourth, seventh, and eighth claims of unjust enrichment, conversion, and theft. In its Combined Brief in Support of Plaintiffs' Motion for Partial Summary Judgment

and Brief in Opposition to Defendants' Motion for Partial Summary Judgment, the San Juan Group states that, "[r]esolution of the issue [of whether Section 29 Credits should be included in the determination of when 'payout' occurs] will affect the Plaintiffs' ... Unjust Enrichment, Conversion, [and] Theft ... claims." (Plaintiffs' Combined Brief, p. 2).

Indeed, in its unjust enrichment claim, the San Juan Group alleges that because the Amax Suit # 5–5 reached payout "at the latest in May 1994," Plaintiffs have not received the appropriate revenues and tax credits associated with the well. They accuse EnerVest of wrongfully taking and selling these interests allegedly owned by the San Juan Group. Plaintiffs claim that EnerVest would be unjustly enriched if allowed to retain the benefits of production since "payout" which Plaintiffs allege occurred in May 1994. (Complaint ¶¶ 50–52). Likewise, in the San Juan Group's conversion claim, it alleges that Defendants have wrongfully possessed and continue to wrongfully possess property which Plaintiffs have owned since "payout" which the San Juan Group contends occurred in May 1994. (Complaint ¶¶ 66–70). Finally, in their claim for theft, the San Juan Group states that EnerVest has knowingly and intentionally taken steps to deceive Plaintiffs by: failing to report costs, expenses, and revenues attributable to the Amax Suit # 5–5 before and after payout; failing to advise when payout occurred; taking Plaintiffs' share of gas production after payout; selling such production; keeping the net revenues attributable to such production; and usurping all Section 29 Credits attributable to gas produced and sold after payout. (Complaint ¶¶ 71–74). Again, this claim is based on Plaintiffs' contention that payout occurred in May 1994.

I have determined that Section 29 Credits are not to be taken into account in determining when "payout" occurred on the Subject Wells. Therefore, the San Juan Group's reliance on the contention that payout occurred in May 1994 is mistaken. This moot assumption is a funda-mental predicate interwoven in the San Juan Group's claims of unjust enrichment, conversion, and theft. Although Plaintiffs contend that they did not receive required statements or revenues from Defendants until 1997, even after the payout date proposed by Defendants, because Plaintiffs premised their claims on a "payout" date of May 1994, Plaintiffs cannot prevail on these claims. As Plaintiffs appear to concede, my decision on the effect of the Section 29 Credits undermines their unjust enrichment, conversion, and theft claims. Therefore, I dismiss these claims.

## VI.

In summary, the San Juan Group's remaining claims are:

(1) breach of contract (two counts);

(2) quiet title;

(3) declaratory judgment (to the extent it does not involve Section 29 Credits);

(4) slander of title; and

(5) accounting.

EnerVest's counterclaims remain.

Accordingly, I ORDER that:

(1) Defendant EnerVest's motion for summary judgment on the San Juan Group's claim for Declaratory Judgment is GRANTED to the extent it implicates Section 29 Credits and the calculation of "payout"; Plaintiff the San Juan Group's cross-motion for summary judgment on this same claim is accordingly DENIED;

(2) Defendant EnerVest's motion for summary judgment on the San Juan Group's claim for Quiet Title is DENIED; and

(3) Defendant EnerVest's motion for summary judgment of the San Juan Group's claims for Unjust Enrich-

ment, Conversion, and Theft is GRANTED.